UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X    **Case No.** 22-cv-848

ANDY MARCIAL,

        Plaintiff,        **<u>COMPLAINT</u>**

 - against -

                 **PLAINTIFF DEMANDS**

CHOICE PRODUCTS & SERVICES, INC.,   **A TRIAL BY JURY**
SUNIL MATHEW, ARTHUR UMANSKY, and
WAYNE HUGHES,

        Defendant.

----------------------------------------------------------------------X

   ANDY MARCIAL, ("Plaintiff"), by and through his attorneys, PHILLIPS &

ASSOCIATES, Attorneys at Law, PLLC, against CHOICE PRODUCTS & SERVICES

("Defendant" or "CHOICE"), Sunil Mathew (hereafter "MATHEW"), Arthur Umansky

("UMANSKY"), and WAYNE HUGHES ("HUGHES"), alleges upon knowledge as to himself

and his own actions and upon information and belief as to all other matters as follows:

## <u>NATURE OF THE CASE</u>

1. This is a civil action based upon Defendant's violations of Plaintiff's rights guaranteed to

  him by: (i) **<u>Title VII of the Civil Rights Act of 1964</u>**, as amended ("Title VII"); (ii) **<u>42</u>**

  **<u>U.S.C. Section 1981 of the Civil Rights Act of 1866</u>** ("Section 1981"); (iii) the **<u>New York</u>**

  **<u>State Human Rights Law</u>**, New York State Executive Law § 296 *et seq.* ("NYSHRL");

  and (iv) any other claim(s) that can be inferred from the facts set forth herein.

2. Plaintiff seeks redress for the injuries he has suffered as a result of his employer's

  **<u>discrimination and retaliation</u>** solely on the basis of his race (Hispanic), national origin

  (Puerto Rican), and his sex (male).

## JURISDICTION AND VENUE

3.    Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §§1331 and 1343.

4.    The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. §1367.

5.    Venue is proper in this district in that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York. 28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

6.    Plaintiff timely filed a charge of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

7.    Plaintiff received a Notice of Right to Sue from the EEOC dated July 1, 2021, with respect to the instant charges of discrimination.  A copy of the Notice is annexed to this Complaint as Exhibit A.

8.    This action is being commenced within 90 days of receipt of the Notice of Right to Sue, as the parties executed a tolling agreement on August 17, 2021.

## PARTIES

9.    Plaintiff ANDY MARCIAL ("Plaintiff") is a Puerto Rican man and a resident of the State of New York, Queens County.  At all relevant times herein, Plaintiff was an employee of Defendant CHOICE PRODUCTS & SERVICES.

10.    At all relevant times herein, Plaintiff was and is a "person" and an "employee" entitled to protection as defined by state and federal laws.

11.    At all relevant times herein, Defendant CHOICE PRODUCTS AND SERVICES

("CHOICE") is a corporation organized under the laws of the State of New York and is headquartered at 135 Eileen Way, Syosset, New York 11791.  Defendant CHOICE provides commercial telecommunications services in the metropolitan New York area.

12.    At all times relevant, Defendant Sunil Mathew (hereafter "MATHEW") is and was an employee of Defendant CHOICE holding the position of Assistant Warehouse Manager.

13.    At all times material, Defendant MATHEW was Plaintiff's supervisor and had the ability to make decisions regarding the terms and conditions of Plaintiff's employment. Defendant MATHEW is being sued herein in his official and individual capacities.

14.    At all times relevant, Defendant Arthur Umansky ("UMANSKY") is and was an employee of Defendant CHOICE holding the position of Vice President of Purchasing.

15.    At all times material, Defendant UMANSKY was Plaintiff's supervisor and had the ability to make decisions regarding the terms and conditions of Plaintiff's employment. Defendant UMANSKY is being sued herein in his official and individual capacities.

16.    At all times relevant, Defendant Wayne (last name unknown) (hereafter "WAYNE") is and was an employee of Defendant CHOICE holding the position of Warehouse Manager.

17.    At all times material, Defendant WAYNE was Plaintiff's supervisor and had the ability to make decisions regarding the terms and conditions of Plaintiff's employment.  Defendant WAYNE is being sued herein in his official and individual capacities.

## MATERIAL FACTS

18.    Plaintiff worked for Metropolitan Wireless Group for over ten (10) years and was considered an exemplary employee while there.  He was never disciplined, had excellent

performance reviews, and was given raises/bonuses every year during his employment with MWG.

19. Upon information and belief, on or about August 2019, MWG and CHOICE merged into one company. On August 21, 2019, based on recommendations from MWG colleagues, Plaintiff was transferred from MWG to CHOICE's offices and began to work in Defendant CHOICE's warehouse. Plaintiff's pay while employed by CHOICE was $30/hour and Plaintiff earned approximately $71,000/year with overtime. Plaintiff was terminated within fourteen (14) months following his transfer.

20. Upon arriving at CHOICE, Plaintiff was placed under the direction of MATHEW and WAYNE. Defendants MATHEW and WAYNE had supervisory authority over Plaintiff and the power to direct and control Plaintiff's duties and responsibilities.

21. From August 2019 through February 2020, Plaintiff was given several positive performance reviews for his work at CHOICE during the transition despite the discriminatory treatment he was forced to endure during this time.

22. While Plaintiff's performance at CHOICE was excellent following his transfer, MATHEW, UMANSKY, and WAYNE began criticizing Plaintiff's work and discriminating again Plaintiff by harassing, demeaning, berating, and referring to Plaintiff in a derogatory fashion with racial slurs in front of clients and co-workers. In fact, these individuals began to intentionally and maliciously interfere with Plaintiff's work and refrained from providing him essential information in order to hinder his ability to perform his work in a satisfactory manner, thereby attempting to manufacture a pre-textual reason for Plaintiff's termination.

23. Moreover, Mathew's wife, Carol Mathew ("Carol"), was upper management at CHOICE,

holding the title of Office Floor Manager and therefore being Plaintiff's direct superior, leaving Plaintiff with no realistic recourse for reporting and addressing the discriminatory and retaliatory treatment Plaintiff was encountering.  Carol was also involved in Plaintiff's discipline throughout Plaintiff's employment with CHOICE.

24.    Compounding Plaintiff's circumstances, CHOICE had no avenue for Plaintiff to report this discriminatory treatment.  CHOICE had no Human Resources ("HR") Department, no method or forms for formal complaints, and no one designated for receipt of workplace complaints.  Nonetheless, Plaintiff persisted in making complaints to Tammy Vorrasi ("Vorrasi"), National Director at CHOICE and General Manager of the building Plaintiff worked in, and others hereafter, making at least a dozen (12) complaints regarding the discriminatory and retaliatory treatment he experienced at Defendant CHOICE.  CHOICE at no point made any efforts to remedy the situation and took no corrective action with MATHEW, UMANSKY, or WAYNE.

25.    Immediately following Plaintiff's transfer to CHOICE in August 2019, MATHEW, UMASNKY, and WAYNE began referring to Plaintiff as "spic" and "beaner," with full knowledge that Plaintiff was Puerto Rican. Plaintiff repeatedly asked for these individuals to refrain from referring to him in such derogatory terms to no avail.   Even repeated conversations with Vorrasi and Carol did not convince CHOICE to take corrective action to address this discriminatory and retaliatory treatment.  Some of the comments made during this time period included: "Come on beaner, I thought you came highly recommended," "Holy shit I thought you Mexicans were hard workers," and "Let's go beaner! Andale! Andale!"  Further, this was not a circumstance of isolated incidents occurring sporadically, but rather typical of Plaintiff's workplace environment in which

Plaintiff was humiliated and screamed at on a daily basis.

26.     In fact, within two (2) weeks of working at CHOICE, Plaintiff had a mechanical issue with his car which caused him to be late for work.  Plaintiff informed his supervisors, but MATHEW, UMANSKY, and/or WAYNE immediately approached Vorrasi calling for his termination, causing Plaintiff to fear for his job.

27.     Given this consistent, constant, and repetitive discrimination, harassment, and retaliation, Plaintiff became terrified to speak in the workplace and began suffering from anxiety attacks, having as many as twenty-five (25) during the fourteen (14) months he was employed by CHOICE, many occurring at work.

28.     Plaintiff's circumstances were exacerbated because this type of hostile work environment was prevalent, apparent, and utterly tolerated at CHOICE, with MATHEW, UMANSKY, and WAYNE treating others in a similar fashion to Plaintiff.  WAYNE would repeatedly refer to Plaintiff's female co-workers as "cunts," saying things such as "There goes one of the cunts," and calling clients and co-workers "stupid cunts" or saying "dumb fucking cunts don't know anything."  WAYNE was reprimanded multiple times for this behavior, but CHOICE continued to tolerate the patently hostile work environment by retaining WAYNE.

29.     On or about August 28, 2019, MATHEW told Plaintiff that a gay man named Ace worked at the company.  MATHEW told Plaintiff to be careful because "he might find you cute and make a move," referring to this gay man as an "ass pirate" and "faggot" who might "grab your ass."  Moreover, throughout Plaintiff's employment, MATHEW, UMANKSY, and WAYNE would regularly refer to Plaintiff, Ace, and other gay men as "faggots" and "queers."  Plaintiff felt extremely uncomfortable and embarrassed by this inappropriate

behavior.

30.     Throughout Plaintiff's employment with CHOICE, MATHEW used his wife Carol's position as Office Floor Manager at CHOICE as a psychological weapon against Plaintiff, telling him that "she has the power to get you fired," and using it as leverage to let Plaintiff know that no matter what Plaintiff reported to CHOICE, Mathew would go unpunished. In this respect, Plaintiff was discouraged from reporting the treatment he was receiving and felt that regardless of any action he might take, the discrimination would continue.

31.     Regardless, Plaintiff reported the discriminatory treatment by MATHEW, UMANSKY, and WAYNE to Vorrasi on a regular basis.  Only after multiple complaints would she take any type of action.  Even after approaching Vorrasi, MATHEW continued to tell Plaintiff that no matter what, MATHEW would go unpunished, and that Plaintiff would be terminated before he would.   Indeed, their discriminatory treatment of Plaintiff only became more intense each time he reported their actions.

32.     In or around October or November of 2019, Plaintiff was assisting a client on the phone. Plaintiff called MATHEW over to assist, and while the client was still on the phone, MATHEW said: "Is that Patricia?  If it is, tell that Asian bitch to keep the phones, fuck her. I charged her for free phones so tell her to sell that shit cause I'm not taking them back." The client heard the entire exchange and realized that not only had she been charged for free phones, but that it was on account of her race.  The client contacted management and MATHEW was written up, but both MATHEW and Vorrasi blamed Plaintiff and told him he "was in the wrong."  This type of behavior, in which CHOICE would improperly charge clients or manipulate clients' orders was a regular occurrence for which Plaintiff was normally blamed in an effort to create a pre-textual reason for Plaintiff's termination.

33.  On or about November 1, 2019, Plaintiff complained to Vorrasi about the treatment that he was being forced to endure.  Vorrasi's response was to call a meeting, but she took no corrective action.

34.  On or about November 7, 2019, WAYNE brought his daughter to visit the workplace and introduced Plaintiff to her as the "warehouse beaner."  Even WAYNE's daughter was embarrassed and ashamed of her father and expressed disapproval.

35.  On or about November 14, 2019, WAYNE sexually assaulted Vorrasi in front of Plaintiff. WAYNE grabbed Vorrasi by the waist as Vorrasi was leaning bent over a table and mimicked a sexual motion.  Plaintiff immediately reported this conduct to Carol and expected WAYNE to be fired, or at least disciplined, but no disciplinary action was taken. This incident made it clear to Plaintiff that absent physical violence on the part of his harassers, CHOICE would take no corrective action to address Plaintiff's circumstances.

36.  On or about December 10, 2019, UMANSKY said to Plaintiff: "You're Mathew's bitch. Oh, correction, Mathew's little bitch."  Similarly, on or about December 13, 2019, UMANSKY again called Plaintiff "Mathew's little bitch" and said: "do you suck his dick too?"

37.  On or about December 16, 2019, WAYNE called Plaintiff over to his desk to see a Youtube video he described as "hilarious."  The video was of a man called "The Amazing Racist." This was a video containing offensive and racist monologues and interactions with individuals concerning minority stereotypes, specifically African Americans and Hispanics.  Plaintiff was appalled and expressed his distaste, but WAYNE continued to watch the video at maximum volume for Plaintiff to hear.  Plaintiff then walked away to remove himself from the situation, at which point WAYNE walked over to Plaintiff's work

area and proceeded to play another one of "The Amazing Racist" videos, forcing Plaintiff to watch. When Plaintiff mentioned that WAYNE was acting in a racist fashion, WAYNE merely laughed and continued to ridicule Plaintiff. Plaintiff understood that WAYNE was insinuating that Plaintiff was inferior because of his race/national origin. WAYNE repeated this conduct on other occasions, forcing Plaintiff to watch other such racist and offensive videos.

38.     On or about December 18, 2019, in an attempt to change the dynamic between himself and his superiors, Plaintiff engaged in conversation with WAYNE concerning his fiancé and showed WAYNE a picture of her. WAYNE grabbed Plaintiff's phone out of his hand and began to call co-workers over to show them her picture. He then told these co-workers that Plaintiff was lying about his fiancé, saying "Why the hell would she want to be with him" and insinuating that Plaintiff wasn't enough of a "man" to be in a relationship with such a woman. In the days that followed, WAYNE repeatedly asked Plaintiff to show WAYNE the picture of his fiancé because he wanted to "get aroused," and from this point forward, WAYNE regularly made comments regarding Plaintiff's fiancé.

39.     On or about January 22, 2020, Plaintiff again approached Vorrasi and demanded that she confront WAYNE concerning the racial discrimination and threats to have Plaintiff fired. Vorrasi's response was: "I should've fired both Mathew and Wayne a long time ago. I've known the way they are since before you started working here, Wayne's an asshole." Regardless, Vorrasi did not confront MATHEW, UMANSKY, or WAYNE and continued to accept and tolerate their behavior, thereby failing to address Plaintiff's complaints or take any corrective action thereto.

40.     In a meeting subsequent to this in which WAYNE and Vorrasi were present, Plaintiff again

complained about WAYNE's racist and sexual comments toward Plaintiff. WAYNE admitted to his harassment, but Vorrasi refused to take any corrective action despite WAYNE's admission. Furthermore, WAYNE then began to further retaliate against Plaintiff in response to Plaintiff's accusations by increasing the intensity of his harassment of Plaintiff.

41. During this time period, Vorrasi informed Plaintiff multiple times that she was "aware of the wrong things Mathew was doing with customers," and that she "should've fired him a long time ago," but said "I can't do it because of his wife Carol."

42. During this time period, MATHEW regularly charged customers extra and improper freight charges and attempted to frame Plaintiff for these improper charges so that CHOICE would have a pre-textual reason to fire Plaintiff.

43. On or about February 17, 2020, WAYNE intentionally asked for the same vacation time as Plaintiff after learning that he was taking his daughter on vacation. WAYNE did this so that Plaintiff would have to cancel his vacation time.

44. On or about March 4, 2020, Plaintiff again confronted both MATHEW and WAYNE concerning their discrimination, retaliation, and harassment. Plaintiff asked why he was not treated the same as others in the department. The two men merely laughed this event off. Plaintiff was so distraught at this point that he suffered from yet another anxiety attack and was forced to take time out of work to address his mental and emotional distress.

45. On or about March 10, 2020 MATHEW and UMANSKY were talking about Ace, a gay man employed by Defendant CHOICE. The men called Ace a "faggot" and accused Plaintiff of being "butt buddies" with Ace. They asked Plaintiff if he "let Ace put it in your ass…Be careful or you'll be swinging the wrong way soon." MATHEW told UMANSKY

that Plaintiff "goes up front to have an orgy with the two faggots," this meaning Ace and Shane, another front office employee.  Plaintiff was repeatedly harassed in this fashion, in which he was accused of being a gay "faggot," with comments such as "go talk to your butt buddy about this since you guys are so close."

46.    On or about April 24, 2020, UMANSKY complained to Vorrasi again about an error that was not Plaintiff's fault, thereby belittling and embarrassing Plaintiff and making him look foolish in front of his co-workers, calling him a "fucking piece of shit."

47.    On or about May 18, 2020, MATHEW berated Plaintiff in front of the entire company, screaming, and calling him a "stupid idiot."  Instead of MATHEW being reprimanded, Plaintiff was written up.  Plaintiff again complained to Vorrasi about this discriminatory and retaliatory treatment he had been receiving.  Vorrasi's response was that she would not tolerate unprofessional behavior in the office, yet Vorrasi took no corrective action and did not reprimand anyone other than Plaintiff.

48.    On or about May 21, 2020, Plaintiff took note that MATHEW and WAYNE had begun to refrain from sharing essential information critical to Plaintiff's performance.   In this respect, MATHEW and WAYNE would refrain from providing Plaintiff with proper ordering and pricing information for his clients, causing Plaintiff to improperly service and charge clients.  Despite his efforts to confront them about this, MATHEW and WAYNE did not relent in their efforts to hinder Plaintiff's performance, thereby attempting to create a pre-textual reason for Plaintiff's termination.

49.    On or about May 28, 2020, Plaintiff again complained to Vorrasi about the discriminatory and retaliatory treatment he had been receiving.  Vorrasi's response was dismissive and focused   on   the   business   elements   of   Plaintiff's   complaints,   thereby   ignoring   the

discriminatory and retaliatory treatment he had been forced to endure.  Vorrasi took no corrective action following this complaint.

50.    On or about June 9, 2020, Chris informed Plaintiff that Vorrasi was unhappy that Plaintiff was taking notes and keeping a record of the discriminatory and retaliatory treatment Plaintiff was receiving.  Plaintiff felt that he was being singled out and discouraged from documenting and reporting the discriminatory and retaliatory treatment he was experiencing.

51.    On or about June 10, 2020, Chris informed Plaintiff that pursuant to Vorrasi's direction, all of Plaintiff's dealer calls were to be forwarded to MATHEW, UMANSKY, and WAYNE, thereby preventing Plaintiff from adequately performing his job.

52.    On or about July 8, 2020, MATHEW made an error by failing to charge a client.  He turned to Plaintiff and told him it was "probably your girlfriend up front who fucked this up." Given that Plaintiff had repeatedly expressed his distaste for these types of comments, Plaintiff was upset and felt humiliated given the insinuation that he was gay and romantically involved with Ace.

53.    On or about July 14, 2020, MATHEW again threatened to have Plaintiff fired, telling him a word to his wife would be enough.

54.    On or about July 27, 2020, CHOICE ended its relationship with Ace.  MATHEW, ARTHUR, and WAYNE began making homophobic remarks to Plaintiff such as: "They let go of your butt buddy Andy, are you sad your girlfriend's gone? You don't have your girlfriend to talk to.  Now we don't have to worry about him trying to grab our ass.  I'm glad they got rid of that fairy.  Whose dick is Andy going to suck now?"  Plaintiff felt humiliated and at this point knew that nothing he said or did would reign in the abuse that

he was being forced to endure.

55. By August 2, 2020, MATHEW and WAYNE had continued to refrain from providing Plaintiff information essential to his performance, thereby deliberately leading Plaintiff to make mistakes absent his fault.  In this fashion, MATHEW and WAYNE attempted to create a pre-textual reason for Plaintiff's termination.

56. On or about August 5, 2020, MATHEW again humiliated Plaintiff in front of his co-workers, at one point yelling at him: "I don't want you talking your Spanish bullshit either," and mocking the Spanish language thereafter.  MATHEW, ARTHUR, and WAYNE regularly informed Plaintiff during his time with defendant CHOICE that he was not to talk Spanish.

57. On or about August 10, 2020, Plaintiff complained to his superiors that he was not being provided the necessary information to perform his job and was being kept out of the loop of communication with his clients.  No corrective action was taken by Defendant CHOICE.

58. By or before August 17, 2020, Plaintiff was being bypassed on his orders. These orders were thereby being sent directly to MATHEW, frustrating Plaintiff's work effort and performance.  This was done intentionally in order to prevent Plaintiff from adequately performing his job.  Thus, Defendants were again engaging in an effort to manufacture a pre-textual reason for Plaintiff's termination.

59. On or about September 24, 2020, Plaintiff was talking to a client in Spanish, as the client preferred.  After ending the call, MATHEW started to mock the Spanish language and told Plaintiff "tell GiGi [the client] this is America and to speak English, I don't want you speaking Spanish to dealers, I want to know what you're talking about."  Plaintiff attempted to explain that his client preferred to talk in Spanish to no avail.

60.    On or about September 28, 2020, Plaintiff confronted Ron Verma, owner of Defendant CHOICE, to complain about the discriminatory and retaliatory treatment he was experiencing.   Plaintiff said he'd had "the worst year of my life," and that he was "afraid to open my mouth, afraid to walk in the door, afraid to park in the parking lot."  He told Mr. Verma: "I don't know what to do," "every day I come in, they're out to get me." Yet, Mr. Verma was unconcerned, commenting: "We cannot force you to be here.  It's your call," and "I don't know what's going on.  I try to stay away from controversy." Mr. Verma took no corrective action following this conversation with Plaintiff.

61.    On or about October 26, 2020, Plaintiff was terminated by CHOICE.  Defendants cited financial difficulties, but Plaintiff questioned this reasoning in that he was and had been performing his job above and beyond expectations despite the treatment and interference he had been forced to endure.  Other similarly situated employees who had been performing worse than Plaintiff were not terminated.

62.    Plaintiff was not provided with any paperwork following his termination, aside from the offer of a severance package in which Plaintiff would waive his right to sue CHOICE and/or its employees.  Plaintiff rejected this severance package.

63.    Plaintiff was never given any official notice before his termination that his job performance or any other actions were cause for termination.

64.    Plaintiff was and had been performing his work in a more than satisfactory fashion prior to his termination.  In fact, Plaintiff had been significantly outperforming MATHEW and WAYNE, his supposed superiors.

65.    Plaintiff has been so emotionally distressed by the harassment and retaliation that he was subjected to during his employment with Defendant CHOICE that he was compelled to

seek mental health counseling.  Plaintiff's mental health counselor has identified Plaintiff's symptoms of depressed mood and diagnosed him with F32.1 Major Depressive Disorder as a direct result of his traumatic employment with Defendant CHOICE.

66.    As a direct result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other damages which such employment entails.

67.    As a direct result of the acts and conduct complained of herein, Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff further experienced severe emotional distress.

68.    Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

69.    As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

70.    Further, Plaintiff is entitled to liquidated damages in an amount to be determined at trial, because the Defendants willfully violated Title VII, Section 1981, and the NYSHRL by discriminating and retaliating against Plaintiff.

### AS AND FOR A FIRST CAUSE OF ACTION
*Race Discrimination in Violation of Title VII*
*(Against Defendant CHOICE)*

71. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

72. Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-2(a)(1), states in relevant part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment,

because of such individual's **race**, color, religion, sex, or national origin[.]

73. As described above, Defendant CHOICE discriminated against Plaintiff on the basis of his race, in violation of Title VII, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, severe or pervasive harassment of Plaintiff based on his race.

74. As a result of the unlawful discriminatory conduct of Defendant CHOICE in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

75. The unlawful discriminatory actions of Defendant CHOICE constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

### AS AND FOR A SECOND CAUSE OF ACTION
*National Origin Discrimination in Violation of Title VII*
*(Against Defendant CHOICE)*

76. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

77. Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-2(a)(1), states in relevant part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or **national origin**[.]

78. As described above, Defendant CHOICE discriminated against Plaintiff on the basis of his

national origin, in violation of Title VII, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, severe or pervasive harassment of Plaintiff based on his national origin.

79. As a result of the unlawful discriminatory conduct of Defendant CHOICE in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

80. The unlawful discriminatory actions of Defendant CHOICE constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### *Sex Discrimination in Violation of Title VII*
*(Against Defendant CHOICE)*

81. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

82. Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-2(a)(1), states in relevant part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **sex**, or national origin[.]

83. As described above, Defendant CHOICE discriminated against Plaintiff on the basis of his sex, in violation of Title VII, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, severe or pervasive harassment of Plaintiff based on his sex.

84. As a result of the unlawful discriminatory conduct of Defendant CHOICE in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

85. The unlawful discriminatory actions of Defendant CHOICE constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### *Retaliation in Violation of Title VII*
*(Against Defendant CHOICE)*

86. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

87. <u>Title VII of the Civil Rights Act of 1964</u>, *as amended*, <u>42 U.S.C.</u> §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

88. As described above, Plaintiff engaged in protected activities, including making internal complaints regarding Defendant CHOICE's discrimination based on Plaintiff's national origin and sex.

89. As described above, after Plaintiff engaged in activity protected by Title VII, Defendant CHOICE took adverse actions against Plaintiff by, *inter alia*, terminating his employment, that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

90.   Defendant CHOICE violated the section cited as set forth.

91.   Plaintiff is entitled to the maximum amount allowed under this statute/law.

## AS AND FOR A FIFTH CAUSE OF ACTION
### *Discrimination in Violation of Section 1981*
*(Against Defendants)*

92.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

93.   42 U.S.C. § 1981 states in relevant part as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

94.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, by discriminating against Plaintiff because of his race, national origin (Puerto Rico), and sex.

95.   Plaintiff was subjected to negative disparate treatment, discrimination, humiliation, embarrassment, adverse employment actions and loss of employment due to his race, national origin, and sex.

96.   Plaintiff is entitled to the maximum amount allowed under this statute/law.

## AS AND FOR A SIXTH CAUSE OF ACTION
### *Retaliation in Violation of Section 1981*
*(Against Defendants)*

97.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

98.   By the acts and practices described above, Defendants retaliated against Plaintiff for his opposition to unlawful discrimination under 42 U.S.C. §1981.

99.    Defendants acted with malice and/or reckless indifference to Plaintiff statutorily protected rights.

100.    Plaintiff is entitled to the maximum amount of damages allowed under this statute.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
*Discrimination in Violation of the NYSHRL*
*(Against Defendant CHOICE)*

101.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

102.    New York State Executive Law §296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, **race**, creed, color, **national origin**, **sexual orientation**, military status, **sex**, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

103.    As described above, Defendant CHOICE discriminated against Plaintiff on the basis of his race (Hispanic), national origin (Puerto Rico), sexual orientation, and sex in violation of NYSHRL, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, based on Plaintiff's national origin.

104.    As a result of Defendant CHOICE's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which he is entitled to an award of monetary damages and other relief.

105.    Defendant CHOICE's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive

damages.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### *Retaliation in Violation of the NYSHRL*
#### *(Against Defendant CHOICE)*

106.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

107.   New York State Executive Law § 296(7) provides that:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she filed a complaint, testified, or assisted in any proceeding under this article.

108.   As described above, after Plaintiff engaged in activity protected by the NYSHRL, Defendant CHOICE took adverse actions against Plaintiff by, *inter alia*, terminating his employment, that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

109.   Defendant violated this section as set forth herein.

110.   Plaintiff is entitled to the maximum amount allowed under this statute/law.

## AS AND FOR A NINTH CAUSE OF ACTION
### *Aider and Abettor Liability in Violation of the NYSHRL*
#### *(Against Individual Defendants)*

111.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

112.   New York State Executive Law § 296(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

113.   Defendants engaged in an unlawful discriminatory practice in violation of New York State

Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

114.    Plaintiff is entitled to the maximum amount allowed under this statute/law.

## **JURY DEMAND**

115.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this action.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, Section 1981, and NYSHRL in that Defendants discriminated against Plaintiff on the basis of his race, national origin, sexual orientation, and sex, and retaliated against Plaintiff by terminating Plaintiff for engaging in protected activity;

B.    Awarding damages to Plaintiff for all damages resulting from Defendants' unlawful discrimination and retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages related to injuries suffered as per Plaintiff's State-law claims;

D.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

E.    Awarding Plaintiff punitive damages;

F.    Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: Garden City, New York
February 15, 2022

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By:          /s/
         Darnisha A. Lewis-Bonilla, Esq.
         *Attorneys for Plaintiff*
         585 Stewart Avenue – Suite 410
         Garden City, New York 11530
         T: (212) 248-7431
         F: (212) 901-2107
         dlewis-bonilla@tpglaws.com